THATCHER et al. *v.* ROCKWELL.

1. Ordinarily a plea *puis darrein continuance* is a waiver of all the former pleas. When filed, not as a substitute, but as a supplemental plea, by leave of the court, and so treated at the trial, its effect is not to waive the other pleas.

2. Under the Revised Statutes of the United States, the jurisdiction of the Federal courts is exclusive of the State courts in matters and proceedings in bankruptcy, but this statutory provision does not operate to divest the State courts of jurisdiction in independent suits by or against the assignee in bankruptcy.

3. Where suits are *pending* in the name of the bankrupt before he is adjudicated to be such, they may be prosecuted to judgment, either in the name of the bankrupt, or in the name of the assignee if he elects to have himself substituted. Such suits do not abate by reason of the bankruptcy.

4. Section 2 of the act of June 22, 1874, amendatory of the Bankrupt Act of 1867, neither operated to confer jurisdiction upon the State courts, nor to abridge it as to the class of actions therein named. Its only effect was to empower Federal courts of original jurisdiction to direct certain suits to be brought in the courts of the State where the bankrupt resided.

5. If, after adjudication, the action, before pending in the name of the bankrupt, be prosecuted to judgment in his name, he is only a nominal plaintiff, and payment to a nominal plaintiff by the judgment defendant, with notice, either actual or constructive, that he was not the real party in interest, would not satisfy the judgment.

6. In construing a charge to a jury, each instruction is to be considered in connection with the entire charge, and if, considering it as a whole, this court is satisfied that the jury was not improperly advised as to any material point in the case, the judgment will not be reversed on account of the charge.

7. There can be no set-off where the claims are not mutual. A separate demand cannot be set-off against a joint demand.

8. An agreement, if it be not collateral, but in the nature of an original agreement to pay the debt of another, founded on a sufficient consideration received by the promisor, is not within the provisions of the statute of frauds, and, therefore, need not be in writing; but if the agreement to answer for the debt of another be wholly collateral, it must be in writing.

*Appeal from District Court of Gilpin County.*

ASSUMPSIT. The declaration consisted of a special count, and the common counts for money had and received,

money loaned and money found due on an account stated. The defendant demurred to the special count; the demurrer was sustained. To the common counts the defendant interposed the pleas of the general issue, payment and set-off. At a subsequent term, to which the cause had been continued, leave was given defendants to file an additional plea, which plea was, in substance, as follows:

"That in the year 1867, the banking house of Warren Hussey & Co. were doing business as bankers with a firm known as J. P. Whitney & Co., composed of one J. P. Whitney, William A. Whiting and plaintiff, and that the business of the latter firm was conducted by said Whiting, who drew check upon the bank of Hussey & Co.; that in November, 1867, the said firm had a settlement among themselves, and that it was then found that the said Whiting had used the money or a portion of it for his own use, and the said Whitney & Rockwell thereupon insisted he should make it good, or that Hussey & Co. should deduct such sum from the debits of said firm, and take the note of said Whiting for the amount he had thus used, to which Hussey & Co. then assented, upon the assurance and promises of both Whitney & Rockwell, that in consideration of the premises they would see that said note was paid; that thereupon Whiting made his note for $3,000, bearing date November 8, 1867, and the same was delivered to Hussey & Co., and the bank account was then corrected by deducting such sum from the debits of said firm of J. P. W. & Co., and that Hussey & Co. never discharged J. P. W. & Co. from liability, but took such note on express agreement of Whitney & Rockwell to see it paid; that some time thereafter, plaintiff and said Whitney came to Hussey & Co., and informed them that Whiting had sold and conveyed to plaintiff all of his real estate and mining property, and had also sold and delivered to him a large amount of personal property, consisting of stock in the Bullion and Inca Mining Companies and other property, and that such sale and conveyance had been made in order

to provide for the payment of the debts of the said Whiting, and that it was in trust for that purpose, to which statement Rockwell assented; and thereupon agreed to pay the note of the said Whiting in consideration of such sale and receipt of the property as aforesaid, to which Hussey & Co. assented, and ever after held the said Whiting discharged from the payment of said note, and looked only to Rockwell therefor; that said Whiting was soon after taken sick and died, and that no steps were ever taken against his estate; that defendants became the successors of Hussey & Co., and took said note in good faith, paying therefor upward of $4,000, and the note was duly assigned to them, and that at the times, in the declaration mentioned, defendants were the owners of the note, and that it was due and unpaid, and that the moneys mentioned in declaration, when received by them, were applied upon the said *note*, the payment of which had been assumed by the plaintiff."

The plaintiff replied, denying payment, also denying set-off, and, as a further replication to the plea of set-off, replied the statute of limitations. The replication to the additional plea denied each and every allegation therein. Issue was joined on the replications.

Leave was then given defendants to file a supplemental plea to the effect that: "Plaintiff was adjudged a bankrupt April 26, 1876, under the act of Congress of March 2, 1867, in the United States district court of the southern district of the State of Illinois, the appointment and qualification of assignee in bankruptcy, the execution by register of the assignment, advertisement by assignee, filing for record in the county of Gilpin, the conveyance by operation of law of all rights of property and choses in action of the said plaintiff to said assignee, and that right of action was then wholly in George Fisher, the said assignee."

To this plea the plaintiff replied, admitting the adjudication in bankruptcy April 26th, 1876, and the appointment and qualification of the assignee, and the conveyance by register, and the record of such conveyance, but,

replying further, alleged that the claim in suit did not pass to the assignee — because, he says: "That heretofore, to wit, on or about the first day of November, 1875, said Rockwell, for a good and valuable consideration assigned, in writing, with Lewis C. Rockwell, the half of said claim, and at or about the same time he assigned to Kate Rockwell the other half of said claim, and said defendants were duly notified of said assignment of said claim at the time the same was made, and on and after the said assigment the said Watson B. Rockwell had no right or interest in and to the said claim now in suit, except to prosecute the same for the use and benefit of the said Lewis C. and Kate Rockwell, and that said Lewis C. and Kate Rockwell are the owners of the claim, and that neither Watson B. Rockwell nor George Fisher, assignee, have any right or title or interest in said claim, or the money to be derived therefrom. And that said Fisher has ever since his appointment been aware of and has full knowledge of the assignment of the claim to Lewis C. and Kate Rockwell, and does not claim any right thereto."

To this replication the defendants rejoined, denying all the allegations therein.

The record shows a stipulation "that it was agreed by the parties to the suit that the firm of Cash, Rockwell & Co. owned and operated certain reduction works in Gilpin county during 1870 and a portion of 1871; that the bank account of C., R. & Co. was kept with the defendants, then engaged in the banking business under the name of Thatcher, Standly & Co. That June 12th, 1871, the defendants were the holders of two notes of Cash, Rockwell & Co., of $5,000 each, secured by trust deed and drawing interest at eighteen per cent per year, and that on the 19th of June, 1871, one of the firm, to wit, Robert Cash, paid to said defendants enough money to pay all of the principal and interest due on said notes, and also to pay all accounts which the defendants had or held against the firm of C., R. & Co., and then and there gave to said Cash a receipt, as follows, to wit:

'Received, Central City, June 19th, 1871, of Robert Cash, ten thousand dollars, in full of all accounts, notes and demands to date, against the firm of Cash, Rockwell & Co.

$10,000.00.                    THATCHER, STANDLY & Co.'"

Which stipulation was read in evidence.

Watson B. Rockwell, sworn: I am nominal plaintiff in this suit; have known Joseph A. Thatcher eleven years; know Joseph Standly; they did a banking business as Thatcher, Standly & Co.; I, together with Robert and James Cash, made and delivered to T., S. & Co., a note for several thousand dollars — first one in March, 1871, for the purpose of balancing an over-drawn account; C., R. & Co. were engaged in reducing ores in the county; works started about the first of April, 1870; continued until about 20th June, 1871; I went away about two weeks after the works started, and, with the exception of two or three months, I was absent until the next March; I was here in the summer of 1871 about three months; it was understood between myself and Cash that he was to take charge of the works; we gave T., S. & Co. two notes of $5,000 each on June 12th, 1871, signed by our individual names; we put them in to pay the note already due for seven thousand, and for money to work with, and we gave the two notes for the loan of ten thousand dollars, the balance over what we then owed was a working capital; on the 19th of June, 1871, I went to Boulder and returned on 22d; I left for the east February 3d, 1873, and I returned October, 1874; in August I had been absent eighteen months; about the first of October I met Mr. Thatcher, and he asked me to call at his house   *   *   *
I went east in February, 1872, and I remained there eighteen months and returned in August, 1873; I don't recollect whether I went east again before January, 1875; I went to London in January, 1875; I had the conversation with Thatcher about the first of October, 1874; Thatcher introduced the subject by reading a letter he had received from Robert Cash—a very insulting and threatening letter.   *   *

After reading the letter he stated that on a certain occasion Robert Cash came to him and proposed to get the money to pay these notes for $10,000 from Prof. Hill, Cash to abandon the works and agree not to operate in the reduction of ores in the county where he would come in competition with Hill; if they could obtain the money, the first money was to go to T., S. & Co., to pay the notes of $5,000 each; if more than enough to pay, then the balance was to go to Robert Cash, and I was not to be paid any of the money, but the notes were to be held in force over me, and the whole amount collected, if possible, from me, and paid to Robert Cash, and Cash agreed to give Thatcher $1,000 for his influence with Prof. Hill; Thatcher said he agreed to this, and did all he could to bring it about, and that, as the result, Hill paid to Cash in their bank $10,000, which was applied toward the payment of these notes; he stated that, so far as collecting the whole amount from me, he never intended to carry that out, and that he was acting for me as a friend. * * * The notes were not canceled, and as I knew he collected from me $2,820 after the notes were paid, he went on to collect from me when I was absent my share of this $10,000, I did not know it had been paid; he claimed at this time that I had made some promise to pay the debt of Mr. Whiting, and he stated that he had applied it in that way; he thought in consideration of what he had done in saving me from paying the $10,000 I should allow the $2,820 to be applied in that way, whether I was under obligation to do so or not; he admitted he had applied it on the notes he held against Mr. Whiting, my father-in-law. * * * This was the first intimation I had of it, or suspected any thing of the kind; the receipt read to jury (see stipulation) is the receipt Cash showed to me; at this time Cash claimed he had paid my portion of the $10,000 to Thatcher, and that I was owing him therefor, and for interest thereon, some $3,000."

Letter of Thatcher, with statement, was here admitted and read as follows :

" Statement. — Cash, Rockwell & Co.   Notes
   to July 2, 1872;   June 12, 1871, two notes,
   $5,000 each............ ................ $10,000 00
Interest paid to September 2, 1871 :
By cash of R. & Co.............    $273 46
  "      "    Robert Cash...........   3,000 00
                                   ——————    3,273 46
Interest on $6,726.54 from September 2, 1871, to
   July 2, 1872, ten months..................    1,008 97
Due July 2, 1872 ..........................    7,735 71

Mr. W. B. ROCKWELL :

Dear Sir — Mr. Cash says he will undertake, with your assistance, to clear up all interest due on notes, and pay all balance on one note on or before August 1, in the following manner, the balance can run a while longer if necessary.   This is the proposition :  You  pay one-quarter of the $2,735.51 — say $683.88 ; you pay one-quarter of $3,000 paid by him last September, $750, making $1,433.88.   He will pay the balance necessary to cancel first note, $1,301.63. This he claims would be in the proportion of three-quarters to your one-quarter.   For instance, he has paid individually say ,

September, 1871 ........................;........    $3,000 00
Will  pay now.............. ................    1,301 63
You will pay..............................    1,433 88
                                        ——————
   Making total payment ....................    $5,735 51
One-fourth of which is $1,433.88.

I must insist that this much be done, and believe you will make the effort to help this payment in some way, to at least this extent.            Yours, truly,

                              J. A. THATCHER."

Witness continued: " I received this letter in New York in July, 1872 ; the notes had been paid in June, 1871 ; at that time he had no claim or demand that I know of against C. R. & Co. ; no part or portion of the 'Statement' was correct; I did not then know the notes were paid."

The following letter of the plaintiff to E. J. Giddings was identified by the witness and read in evidence :

"LONDON, Eng., *November* 27, 1872.

DEAR BRO. E. J.    *    *    *

I have arranged for $3,000 at the bank of the Manhattan Company in New York, or will have it there soon, and I inclose in this two checks against it payable to Thatcher & Co., one for $1,570.93, and the other $1,429.07, and for the following purposes : The first one to pay the interest on my share of the Cash & Rockwell notes to the 15th of December and my share of the balance due at that time on one note, to wit :

| | |
|---|---:|
| Amount due September 2, 1871 | $6,726 54 |
| Interest on same to December 15, 1872 | 1,557 19 |
| | $8,283 73 |
| Deduct one note | 5,000 00 |
| | $3,283 73 |

| | | |
|---|---:|---:|
| One-fourth of same | $820 93 | |
| One-quarter of $3,000 paid by Cash | 750 00 | |
| Due from me December 15, 1872 | | $1,570 93 |

Mr. Thatcher will understand the above. Now when Mr. Cash is ready to pay his proportion of the interest on the whole amount up to December 15, and the balance of the one note, I want that check for $1,570.93 used to pay my proportion. If Mr. Cash should not be ready to pay his proportion at once, I want the amount placed to my credit on Thatcher, Standley & Co.'s books, with the understand-

ing that the amount is placed there for the purpose of
making such payment whenever Cash pays his proportion,
and will be used for no other purpose, and I hereby au-
thorize and desire you to check it out for that purpose, or
any proportion of it, whenever Cash pays his proportion.
And being placed there virtually as a payment, Mr.
Thatcher will of course agree not to charge me further in-
terest on that amount. You and he will both understand
why I do not want any indorsement on the note, excepting
payments made by both parties. Probably for the same
reason that Cash does not.

Now with the other amount I wish to make a special
arrangement with T., S. & Co., if acceptable to them. I wish
to deposit the $1,429.07 check to my individual account
with them, *not* as a payment on the other note, but with
the understanding that as long as it remains there, or
$1,250 of it, my one-fourth of the other note, that they will
treat it as they voluntarily did the amount I left with them
last year, that is, allow me the same interest on it they
charge me on the note. I do not intend, if I can avoid it, to
draw out any portion of $1,250, until it is done for the pur-
pose of paying the other note, but just now I am not in a
position financially, to use it for that purpose, and in case
of emergency I must reserve the privilege of checking out
any portion or all of it. I have no doubt Mr. T. & Co. will
accede to my wishes in this respect; also, I wish further to
propose to Mr. Thatcher that whenever Mr. Cash is ready
to pay the other note, his three-fourths of it, that he accept
it and cancel the note, and for my share, $1,250, I will give
them my note secured by deed of trust on my portion of
the mill, which embraces that wing and *all* the machinery.
This I believe Mr. T. will do, under these circumstances;
the engine and boiler alone are worth that. If he desires
before making the statement to Mr. Cash, that he will
relinquish the note upon his paying three-fourths of it, let
him read the original agreement between Cash & Brother
and Mrs. R., so he will understand how her improvements

there are connected with Cash & Co. You will see that she or her representatives has the right at any time to remove the machinery, etc., and if Mr. T. should accept this last proposition, let him ask his attorney if that agreement between the Cash's and Mrs. R. is sufficient for her to be secure in her rights, standing as they do, upon land claimed or owned by Mr. Cash. It might be advisable to have the agreement recorded, or that portion of it covering the right of property.

I should esteem it a favor if Mr. T. would get Mr. Butler's advice on that, if he is their attorney, and if satisfied in the security of it, I trust he will at once give Mr. Cash the opportunity of paying his proportion of the other note. In case this is done, Mrs. R. better execute the deed of trust and I will sign the note, and in order to have every thing ready then, I will send a note which can be used if required. You will please let Mr. Thatcher read what I have written in regard to this matter. And as I have before written, I wish he would take charge of Mrs. R.'s interest in the mill, and I will say to you especially, do not let that be run in any way, subjecting me to any liability of loss during my absence. Get legal advice, and, if necessary, a notice must be put in the paper that I will not be responsible for any debts contracted by Cash & Co. Before doing this, however, speak to Mr. Cash about it. But if not considered necessary by Mr. Teller, I rather you would do neither, that is, neither advertise it or speak to Cash about it, or say any thing about it any way.

Perhaps Cash, starting up again with a new partner and under a new style of firm, Cash & Co., before it was Cash, Rockwell & Co., will be quite sufficient to clear me of all liability, as it can be shown that neither myself nor Mrs. R. has had any thing to do with this last movement in any way.

Please notify Messrs. Thatcher, Standley & Co. personally, that I will not be responsible for the debts of Cash & Co., but they will please say nothing about this to others. If Cash & Co. should do business at the other bank, I wish

you would also ascertain of them if they consider me one
of the firm, and if so, notify them the same.

Yours, truly,

W. B. ROCKWELL."

The following letter from Thatcher to Rockwell was read
in evidence :

"CENTRAL CITY, <i>April 4th</i>, 1872.

WATSON B. ROCKWELL, Cairo, Illinois :

Dear Sir — Do you hear from Mr. Cash these times ? do
you think he will pay part of the balance on our debt ? I
wish you would stir him up, and in some way help us some
on our claim.   Truly I never saw money so close here since
I have been in business.

(Signed)          J. A. THATCHER."

The following stipulation and letters were also read in
evidence :

"STATE OF COLORADO,   } <i>ss.:</i>
     <i>County of Gilpin.</i> }

In the District Court in and for Gilpin County ; to the Sep-
tember Term, 1877.

| |
|---|
| Watson B. Rockwell |
| <i>v.</i> |
| Joseph A. Thatcher and Joseph Standley. |

It is hereby stipulated that Elijah J. Giddings would, if
on the witness stand in this case, testify as follows :

1st. That he, Giddings, received from Watson B. Rock-
well in due course of mail a letter dated London, England,
Nov. 27, 1872 (and now marked Exhibit "A").

2d. That such letter contained two checks drawn by said
Rockwell in favor of Thatcher, Standley & Co., on a bank
in New York, one check being for $1,578.93, the other for
$1,421.07.

3d. That upon the receipt of said letter he showed Thatcher the instructions contained therein, and delivered to T. S. & Co. their checks as Rockwell's agent.

4th. That afterward, and before the 28th day of January, 1873, Giddings and Thatcher had several talks regarding the disposition of the money specified in said checks; that Thatcher wanted the amount of the two checks applied to the payment of what Thatcher represented to be two unpaid notes of Cash, Rockwell & Co., but that said Giddings on behalf of Rockwell objected to having this done, as it was contrary to the instructions of Rockwell. That Thatcher wrote Giddings two letters regarding this matter, one of which is in pencil and without date (but is now marked Exhibit "B;" the other is dated January 28, 1873, and is marked Exhibit "C.")

That after receiving these letters and having these talks, and without receiving any further instructions from Rockwell, he did permit Thatcher to apply the money on what he supposed were these unpaid notes of Cash, Rockwell & Co., or at least $2,820.92 of such money, and this may be read in evidence.

> H. M. & W. TELLER,
> *Defendant's Attorneys."*

"CENTRAL CITY, Col., *Jan.* 28, 1873.

E. J. GIDDINGS, Esq., Denver, Col. :

Dear Sir—Yours 25th, is to hand, and contents noted. I have no intention of changing my understanding, or having you change your instructions concerning Mr. Rockwell's deposit. My suggestion is for the benefit of Mr. R. in getting himself relieved from the whole 'thing' entirely, and if you, as his agent, and Mrs. R. (who has had some talk with me before your letter came), should insist on the strict letter of Mr. R.'s instructions, then you may embarrass the settlement with C. and this I wanetd to explain to you in person when I was down. You being absent, and I in a hurry, did not attempt it in my note to you.

You see Cash's part amounts to over $5,000, and a week or ten days ago he asked me if he could raise $4,000 money if *his* note secured on works would be taken for balance. This I declined, told him I already had that security, and must if the matter was fixed up have the money or a new security, that was tangible and could be used, etc., etc.; he had no other in Colorado to offer, and so concluded to raise the money, if R. was ready to pay his, etc., by February 1st. Now you see if I take Mr. R.'s note secured on same property or a part of the same, it would certainly cause a 'rumpus' between Cash and I; and besides, there might be other unsettled debts, account, etc., etc., either outstanding against C. & R. or between themselves, and, therefore, I would rather not have any further lien or claim on the works or any part of them. It might involve me in difficulties with either C. or R., or somebody else; and again, if I took the security and trouble arose between C. and R., I would be forced into siding with R., when I could do more good if trouble arises between them, by occupying a neutral ground.

It certainly will make no difference if I agree to loan or advance Mr. R. the $1,250, or any part of it any time he may want to use it; if this matter is paid now by simply taking his paper for it with what security he himself considers good for such an amount, or as the machinery is in Mrs. R.'s name, I will agree to take her name with Mr. R.'s for the $1,250 any time he may want it, and for any reasonable time, on any part of the amount, if not needed, so much the better. The security on the machinery I cannot consistently take and do not want, and this is my reason for suggesting that Mr. R. pay all his part now, and have these old notes and mortgages destroyed.

> Yours, very truly,
>
> THATCHER."

"Dear Gid. — Cash has made an agreement to take up his part of those notes, Feb'y 1st, or about then. I shall

see that they are paid in full before anybody is released. It will take about the $3,000 to pay Rockwell's part, and if I can get Cash to pay his, I want your check on Rockwell's account for his part. Can I go ahead and close this matter up on this understanding? Please ans., as I think it very important that Mr. R. get off that paper as soon as possible.

Yours, hastily,

THATCHER."

Witness continued: "At this time there was no indebtedness of C., R. & Co. to T., S. & Co. * * * In pursuance of these statements and letters of Thatcher, he got of me, to apply on the C., R. & Co. notes, $2,820.93, about December, 1872; I was induced to pay it by the letters from Giddings and Mrs. R. in regard to what Thatcher stated to them, and Thatcher's statements and letters to me; I believed these statements; I assigned a part of the claim in suit to L. C. Rockwell; the claim referred to in the assignment is the claim against Thatcher — the subject-matter in litigation between Thatcher and myself at that time;" the article of assignment bears date November 4, 1875; recites an indebtedness to L. C. Rockwell from W. B. Rockwell and his inability to pay, and concludes: " I hereby sell and transfer and assign unto said Rockwell my interest in and to half the claim I now have in suit in the district court of Gilpin county against Joseph A. Thatcher and Joseph Standley, for the work said Rockwell has already done and what he may hereafter do in said cases until said Rockwell shall be paid for his services in said cases.

W. B. ROCKWELL."

The witness continued : " Have paid L. C. Rockwell nothing since assignment was made; Kate Rockwell is my wife; I was indebted to her often for a number of years; she bought property and had property obtained from her father when he first came to the country; I used money belonging to her, and was indebted to her at the time I made the payment, and the amount I paid I considered half hers

and charged it to her in the account I was keeping with her; I considered half this claim hers; I gave her to understand from the commencement that one-half of it belonged to her; that she was to have one-half if it was collected on account of what I owed her; I told her that at different times; at the time I assigned to L. C. Rockwell I did not assign the whole, because half belonged to her; if the claim was mine, one-half belonged to her; it must have been a year or two previous to my bankruptcy that I talked with her; I do not think my wife signed the trust deed to secure the notes."

*Cross-examination:* "The title to property on which trust deed was made was in my wife; she did not sign trust deed; I did; my wife and I had equal parts in the C., R. & Co. property, but agreement signed only by Mrs. Rockwell. * * The $2,820.93 I sent to Thatcher was my individual money; no part of it was Mrs. Rockwell's money; I don't recollect when I first talked with Mrs. Rockwell about it after I had the talk with Thatcher; after the suit to recover I told her it was understood between us that if any thing was recovered one-half should be hers; it was after I began suit or about that time; can't tell how much I was indebted to her; I was indebted to her for various things; for money and for exchange of mining property, etc., I think as much as $3,000; because when I made the assignment the account stood to her credit more than $1,000; I put in a note of $275 to Mrs. Rockwell * * I told her if I got any thing in this suit she should have one-half; I made no contract in writing, nor assignment in writing; Thatcher told me that he had applied the money toward the payment of the note he held against Whiting; he claimed I had agreed, or practically agreed, to pay it; that I ought to pay it; he handed out the note, and I saw it was indorsed, and I simply said, 'I see.' * * * I had one other conversation with Thatcher in the spring of 1875." (Paper shown witness admitted to be a part of schedule of plaintiff in bankruptcy.) "I then returned the claim of L. C. R. as so much due him; if it is so stated then, I do not

recollect now; I returned the claim as so much secured by the assignment of this claim against Thatcher; and the assignment to Rockwell is the only security I gave him; I did swear that there was no other indebtedness existing against me than those named in schedules; the reason I did not put in the amount due Mrs. Rockwell was that my attorney said it might as well be left out; I put in the $275 because it was a note; I did not put in the $1,000 in schedule because I knew it would not be claimed." Defendant's attorney here asked of the witness: "When you made this assignment to L. C. Rockwell, did you intend it as an assignment of the whole claim or only an assignment to secure Rockwell's debt, whatever that might be?" to which plaintiff objected that it was immaterial and not proper cross-examination, and the court sustained such objection, and the defendants then and there excepted. "In the schedule of bankruptcy I reported this debt to L. C. Rockwell as secured by this claim against Thatcher's schedule made May 26, 1876."

*Re-direct examination:* "Mr. Fisher, the assignee in bankruptcy, has been out here; it is with his knowledge and consent; he examined all the papers and came out here to examine the matter; he knew of the assignment to my wife and considers it proper; I had no intention of going into bankruptcy when I made the assignment to my wife or to L. C. Rockwell; I have computed the interest on $2,820.93, the sum paid, from Jan. 1, 1873, which is $1,337.59."

L. C. Rockwell testified that he notified Thatcher in November, 1875, of the assignment.

The defendants introduced Joseph A. Thatcher, who testified: "I am one of defendants, and know plaintiff, and I knew William A. Whiting in his life-time; he resided in Central; I knew firm of Hussey & Co.; they did business here from 1863 to 1870, banking; he kept a bank account with Hussey & Co., in the name of 'William A. Whiting, agent', J. P. Whitney and W. B. Rockwell were, or appeared to be, interested in that account; Whiting and Rock-

well came to the bank to look over that account in November, 1867; the account had a credit at that time, it was not overdrawn during the time it was on the books; they said Whiting had used about $3,000 of the money drawn out for his own use; I told them that was no affair of ours; I did not know any thing about that; they wished me to take Whiting's individual note and credit the account of 'Whiting, agent;' I refused to do it, and sent for Mr. Palmer (one of the firm of Hussey & Co.); I did not have any interest in the firm; Palmer came, and Rockwell, Palmer and myself had a conversation about the matter; Rockwell urged Palmer to do this, stating that Whiting had been indiscreet in the use of money, and had used Whitney's money for his own purposes, money that belonged to the account of Whiting, agent; Palmer refused, because we were then safe; Mr. Rockwell then told Palmer that Whiting had put into his hands as trustee, or turned over to him all his personal property and real estate, enumerating it, mentioning a lot of stock in Bullion Company of a par value of $100,000 — house and lot and mining property, and that he (R.) would go to New York and Boston and sell it at once; he said I will pay; I assumed to pay Mr. Whiting's debts and will pay Whitney the amount due him, and will pay the $3,000 here."

Question by L. C. Rockwell: "Rockwell assumed to pay Whiting's debts or Whitney's?"

Answer: "He was going to pay Whitney's; Whiting was indebted to Whitney, as well as to Hussey & Co.; he said he proposed to pay this very soon; that he had a partial offer for the stock of Whiting, and that he would pay this $3,000 and that he would give a written obligation on his part to pay this $3,000, but as he did not know how soon he could sell the stock, he and Palmer could not agree when written agreement should become due — when he could pay it; we then considered Rockwell's word as good as his note; the firm of Hussey & Co. then took the note of Whiting and credited the account of 'Whiting, agent;' I wrote to Rockwell about the note while he was in Boston, asking

him to pay the note; he was there a long time; it might have been six months; I don't recollect that I got any answer from him; the note run on; I understood Rockwell was disposing of the Whiting property and paying Whiting's debts, but he paid nothing on this note, but was doing considerable business with us, having frequently more than $3,000 to his credit; in 1870, on the first of January, it became the property of Thatcher, Standley & Co., these defendants; they took it for the full amount of the claim, paying $3,000 for it; we considered it Rockwell's paper, and perfectly good; when I received the $2,820.93, I put it on the note, and I credited on bills receivable February 11, 1873; I indorsed the $2,820.93 on the note, and credited on bills receivable in the usual way; got the money of Giddings; after the money was credited, I first talked with Rockwell about it some time in September, 1874; I told Rockwell I had applied the money Giddings paid me on that note; I showed it to him at my house, and showed him the balance due on the note; he seemed pleased that the amount was paid, and made no objection to it; never said a word in opposition to it; he never, during the three or four years the note had run, claimed that he was not liable on it; he never refused to pay it; I think I first had words with him about the payment of this note in May or June, 1875; he sent me word; he wrote a letter, note, or something; it was put in the mail; the letter was destroyed because I supposed subsequent conversations with R. made it unnecessary to keep it; Rockwell, in that note, said: 'However gratified he was at the settlement of the Whiting matter; that however willing he was to have this matter settled as I had settled it, by applying the $2,820 to the note, his circumstances then would not permit him to allow me to do so without making a demand for recovery — or something of that sort; that he was poor, had lost every thing since this settlement, and wanted me to pay back the money I had credited on the note;' I notified Mr. Rockwell that I had a $736 note that was due; the day after I received this letter I

notified R. that his wife's note for $736 was lying unpaid in the First National Bank, and I wanted him to pay at once; he came to see me next day after that; he apologized for making this demand upon me, and asked pardon, etc.; we talked the matter over fully — the whole circumstances of the payment of the paper; he seemed satisfied with the settlement I had made; asked me to excuse his writing such a letter, and asked what I was going to do about his wife's note; I said, Mr. Rockwell, if you propose to act decently in this matter, I will let this paper run until it suits your convenience to meet it; the matter I spoke of was the whole settlement I made of the application of money on the Whiting note; Mr. Rockwell accepted of my extension, and said it was all right; Mr. Rockwell was satisfied about the matter, and I gave him an extension on the paper; it was not paid for some two or three months afterward; that was the reason I destroyed the letter Rockwell wrote me; I supposed the matter settled; I extended the time of payment to no definite time; it was paid July 28; this conversation was in May."

Witness was here asked to explain the letters read, etc., and he thereupon recited the transaction as to payment of the $10,000, etc., substantially as detailed by Rockwell, with the further statement that it was suggested by Cash that Thatcher get Rockwell to pay the one-fourth and apply it on the Whiting note, and then Cash would not allow witness to make any indorsement on the two $5,000 notes, and that it is the custom of banks to *hold* paper after it has been paid by one party to collect for the party against others equally liable on it, and that was the cause of my writing those letters; "I said it was the custom for banks to hold it and collect off of the other parties without making it known it had been paid, so as to make those contribute toward it."

On cross-examination, the witness testified: "Those notes had been paid when the letters were written; I wrote them for the purpose of making him pay the balance on the

Whiting note; he had postponed the payment so long I had no confidence in his making good his word; I did not tell Giddings and Mr. Rockwell after I got the money what I did with it, because Cash did not *want* I should do so.   * * *

I supposed Whiting and Rockwell were partners; they were engaged in business here; Rockwell came to bank and got a statement of how many checks were out of Whiting's, and kept an eye on his account continually; Whitney never told me he was a partner, but they were continually doing business as that done by partners; Whiting would draw drafts and Rockwell would also draw drafts, and they went with the account of ' Whiting, agent;' I don't recollect that Rockwell or Whiting ever promised to pay me or T., S. & Co., except in the conversation I had with Rockwell. Rockwell said he would pay it in a short time, and that he had the means to pay it of Whiting's in his hands; Whiting was considered perfectly good when the note was executed.   * * *

Rockwell told me (Whiting) had put it (his property) into his hands for the purpose of paying his debts; every dollar he had; and Whiting told me the same thing." Plaintiff here offered a letter of Thatcher's to Rockwell, which was read, of which Thatcher says: "This letter is true thus far, when it was written, June 10th, 1870. T., S. & Co. did not go into existence till July 1, 1870, but we were looking over the affairs and it was supposed that I was ready to exchange that note, and it fell to my part." The letter says: "In the sale Mr. Whiting's note falls individually to me, and cannot I rely upon something from that; I feel I can count on your continued efforts; I assure you it would help me greatly if the debt could be added to my credit in the new firm."

On re-direct examination the witness testified he had written three or four letters to Rockwell about paying the note, and that Rockwell had never refused to pay it; he said he was willing to pay it.

W. B. Rockwell, recalled : · "Whiting died in May,
1871;" defendants introduced petition in U. S. district court
in bankruptcy of W. B. R., and in schedule No. 2, made
by W. B. R., identified by him when examined, in which
schedule of creditors, holding· securities, was Lewis C.
Rockwell, security. Interest in claim against J. A. Thatcher,
suit pending in district court, Gilpin county, Col.; value of
security claim $1,400; amount of debt $455.

In schedule 3: list of assets of said Rockwell, under head
of "choses in action"; "suit pending in district court,
Gilpin county, Col., against Jos. A. Thatcher of Central
City, to recover $2,800 and interest, in which the petitioner
has a half interest," both of which were signed by W. B.
Rockwell.

Defendant rests and plaintiff recalls W. B. R., who testi-
fied that when he made assignment to L. C. R. he took ac-
count as L. C. R. showed it to him from the books, and
made assignment accordingly, and that he thought the
account correct, and made out according to the last bill ren-
dered him.   He then proceeded to explain why he wrote to
Shipman, etc., stating contract, and that Whiting was
owing Whitney $26,000, and that Whitney was going to
foreclose mortgage on the house he lived in'; "Whitney pro-
posed to me to assume the debt of Whiting to him, and he
would give me two or three years' time to pay, and that I
should take of Mr. Whiting all the property he held then
as security, and he, Whiting, must transfer the same to me,
and have my personal obligation beside; I had no time to
consult Shipman ; I bought the property without any con-
ditions whatever; it ·was an absolute sale; I think Mr.
Shipman must have. forgotten something ; I never denied
that I purchased it ; I wrote him I did not buy it as a specu-
lation, but because of the position Whiting was in ; that it
was more of a security than a purchase, though it was an
absolute purchase and transfer; I never told any man I had
promised to pay any thing except the Whiting debt; I
never promised to pay any other ; I never told McCord ; I

had the property in trust; I remember having a conversation with McC., but I did not tell him I had taken property in trust; I said if I realized as much as $100,000 from it I would pay his claim; Whitney's debt was $26,500; I made nothing out of it; I don't think Whiting and Whitney were ever partners; they were working together and owned mining property together, and sold and organized companies; I understood from Whitney they were not partners; I got probably 1,000 or more claims of undeveloped mining property; they had no marketable value. As to Thatcher's testimony, he said: I went into bank and Palmer and T. were in front of the counter, and we had some conversation, and P. asked me about the claim of Whiting's note of $3,000; I told him; Mr. Thatcher asked me about the purchase, and I told him I had bought Whiting out, and he wanted to know what the probability was of Whiting's paying the note; I said if I realized a large amount out of the sale; I don't think T. ever asked me to pay the note, in fact, I know he did not; Palmer asked me if I would not positively agree to pay the note; * * I told him I would not; that I was under no obligation to pay; he asked if I would not agree to pay some part of it, in writing, if he would give up the note, but I refused to do it; I never promised to pay it either verbally or in writing; I heard T.'s testimony about conversation in the bank as to application of money paid in by Giddings; I had before that written to T. demanding a return of this money, but hearing nothing I called at the bank, and he asked me in; he expressed himself hurt at the course I had taken; he thought I ought to be satisfied with what he had done and let him have this $2,800; I did not express myself satisfied with the disposition he had made of it; I did not ratify the disposition he had made of it. In the first conversation we had at his house, I thought I would hear all I could without saying a word; I made no reply whatever, other than simply to say that I understood what he said; the last thing he did was to show me the note; I said, 'Yes, I see;'

my desire was to get all the information I could on the subject before taking any action; I am positive I never promised to pay the Whiting note to anybody; I have a copy of a portion of the letter I wrote to Thatcher about this W. note — a part of the letter — the latter portion of it; at the conversation with T. there was not a word said about forbearing to sue on $736 note." The copy of portion of letter was read as follows:

" CENTRAL CITY, Col., *May* 22, 1875.

Whatever disposition I might have to pay Mr. Whiting's debts, were I in different circumstances, my present financial condition is such that I cannot consent that you should apply the amount I paid you upon the Cash & R. note to the payment of your claim against the estate of Mr. Whiting, and I must now ask that amount, with interest thereon at the rate of 18 per cent per annum."

" I never apologized for writing this letter; I had no interest in the account of ' Whiting, agent,' when credited with the $3,000 note, either directly or indirectly. I never promised I would pay the Whiting debt. I did not know when the note was given, nor before it was given."

· On cross-examination he testified: "I think Young called my attention to the $736 note. After I wrote the letter to Thatcher, the conversation with Thatcher was a few days after I wrote the letter to him. I cannot tell when I·paid the $736. I think some little time after the conversation with Thatcher in the bank—some weeks, I think, Thatcher spoke to me about paying the W. note, three or four times, and he wrote me once; I don't remember whether I made any answer or not; I don't know that I ever denied that I was liable to pay the W. note; T. never claimed I was positively liable until after the application of the money; the agreed price for the property of Whiting was, I was to pay the J. P. Whitney debt, $26,500, and some $1,500 or $1,600 that Whiting had checked out of bank and used the money belonging to Bullion Co.; I gave my draft on New York

for the amount; I agreed to pay *that* and the Whitney debt; I sold the Bullion stock for $25,000; the house and lot was disposed of to Henry Lucius for $3,000; I sold all the mill sites—there was a good many of them; all of the mining claims and mill sites were put into a company and stocked; I think the company was stocked at $2,000,000, and I had one-eighth. This stock was never in my hands and it was of no value."

On re-direct, witness said: "The total amount due after deducting one month's interest would be $4,127.19."

The foregoing is substantially the testimony in the case given by Thatcher and Rockwell. It is not deemed necessary to make any further statement of the testimony.

Among the instructions upon which error was assigned by the appellants, and not substantially given in the opinion, was the following:

"The court instructs the jury that the defendants have pleaded the indebtedness of Rockwell upon the note given by Whiting as an offset in this case, and that the burthen is upon them to prove every fact necessary to establish Rockwell's liability upon said Whiting note, and if they fail to prove every fact necessary to establish the liability of Rockwell to pay said note, by a preponderance of testimony, then they have not established the offset and the plaintiff is entitled to recover the amount of money received by Thatcher and Standley, belonging to Rockwell, and interest thereon at ten per cent per annum till the present time."

The jury found a verdict for the plaintiff in the sum of $4,100. A motion for a new trial was interposed by the defendant and overruled; judgment was entered on the verdict, and the defendants prosecute this appeal.

Messrs. H. M. & W. TELLER; Messrs. BUTLER, WRIGHT & KING, for appellants

Messrs. BELFORD & REED, and Mr. L. C. ROCKWELL, for appellee.

THATCHER, C. J. The appellants here were defendants in the court below. One of the principal questions presented by the record in this case concerns the plea of *puis darrein continuance*, and the evidence introduced under the issue formed by the plaintiff's replication thereto, and the defendants' rejoinder to such replication. By this plea it was set up that plaintiff had been adjudged a bankrupt (since the last continuance of the cause) in United States district court of the southern district of the State of Illinois, the appointment and qualification of one Fisher as his assignee in bankruptcy; that the register in bankruptcy made, executed and delivered to the said assignee an instrument in writing, conveying to him " all the estate, real and personal, together with all books, deeds, and papers relating thereto, of the said plaintiff," and that said assignment was recorded in the office of recorder of deeds of said Gilpin county, September 18, 1876, "whereby the said assignee became and is vested with the title to all the property and estate of the said plaintiff for the use and benefit of the plaintiff's creditors, and that the said plaintiff became divested of all title to said property, including the claim in controversy." Defendants then pray judgment if the said plaintiff sought further to have or maintain his action. To this plea a demurrer was interposed and overruled. The plaintiff then replied confessing the adjudication in bankruptcy, the appointment and qualification of the assignee, and the conveyance by register, and the record of such conveyance, but denies that the claim in controversy passed to the assignee; alleges that the plaintiff, for a valuable consideration, assigned in writing in November, A. D. 1875, to Lewis C. Rockwell, one-half of said claim, and to Kate Rockwell, at about the same time the other half of said claim; that defendants were duly notified of such assignment; that said assignment was well known to the assignee in bankruptcy ever since the appointment; that by reason of the premises the said plaintiff ceased to have any right or interest in and to the said claim or suit, except to prose-

cute the same for the use and benefit of Lewis C. Rockwell and Kate Rockwell." A rejoinder was filed denying the material allegations in said replication.

Ordinarily the plea of *puis darrein continuance* is a waiver of all the former pleas. It is a substitute for, and a retraction of all others upon which no proceedings are afterward had. Gould's Plead., ch. 6, § 122 *et seq.*; Steven's Plead., p. 98.

In this case, however, by leave of court, on motion of the defendants, the plea of *puis darrein continuance* was filed not as a substitute, but as a *supplemental* plea, and as such it was treated at the trial and in all the subsequent proceedings, without objection on part of plaintiff. Its effect was not, therefore, in this instance to waive the other plea.

Was the suit maintainable in a State court? Doubtless in a direct proceeding or matter in bankruptcy the jurisdiction of the circuit and district courts of the United States is exclusive. R. S., U. S., § 711. The State courts are in no proper sense courts of bankruptcy, nor can the suit before us be considered as a proceeding in bankruptcy, even after Rockwell was adjudged a bankrupt. It is an independent suit, and although in a certain aspect its prosecution might be said to be in aid of the bankruptcy proceeding, it is entirely distinct from it. *Wiswall et al.* v. *Campbell et al.*, 3 Otto, 348. As it is no part of the bankruptcy proceeding, it cannot be said that the section of the Revised Statutes cited *supra*, which provides that the jurisdiction of the courts of the United States of all matters and proceedings in bankruptcy shall be exclusive of the courts of the several States, operates to divest the State courts of jurisdiction in independent suits by or against the assignee. Unless by express words or necessary implication the State courts are, by the act, divested of jurisdiction in these independent suits, they have authority to hear and determine them. The jurisdiction of a State court is based upon the Constitution and laws of the State, and not upon

an act of Congress. The right is given by an act of Congress, and may be protected by either the State or Federal courts. Their jurisdiction in this respect, within constitutional and statutory limits, is concurrent. To this effect have been the decisions construing the Bankruptcy Act, before the adoption of the Revised Statutes. *Cook* v. *Whipple*, 55 N. Y. 150 ; *Eyster* v. *Gaff*, 1 Otto, 521 ; *Claflin* v. *Houseman, assignee*, 3 id. 130.

Considering this suit an independent proceeding (*Wiswall at al.* v. *Campbell et al., supra*) we find nothing in the Revised Statutes or subsequent legislation which, in our opinion, affects in any way the jurisdiction of State courts over actions *pending* in the name of the bankrupt before he was adjudicated to be such.

The decisions of the State courts are conflicting as to the true construction of section two of the act of June 22, 1874, amendatory of the Bankrupt Act of 1867, which reads as follows :

"That section one of said act be, and it is hereby amended by adding thereto the following words : 'Provided, that the court having charge of the estate of any bankrupt may direct that any of the legal assets or debts of the bankrupt, as contra-distinguished from equitable demands, shall, when such debt does not exceed five hundred dollars, be collected in the courts of the State where such bankrupt resides, having jurisdiction of claims of such nature and amount.'"

If, when W. B. Rockwell was adjudicated a bankrupt, he had any interest in the claim in suit, if he was not at that time a mere naked trustee, the beneficial interest in the chose in action having been *bona fide* transferred long prior thereto to others, under some of the authorities, the suit could not be prosecuted in the State courts under the section just quoted, either in the name of the bankrupt or of the assignee. In *Olcott, Assignee*, v. *McLean et al.*, 16 Bankruptcy R. 80, the court (supreme court of New York, first department) held that the effect of this provision was to limit the jurisdiction of the State courts to the class of

actions therein named ; that Congress by providing that the collection of debts, not exceeding in amount the sum of five hundred dollars, might be allowed to be prosecuted in courts of the State where the bankrupt resides, having jurisdiction of claims of such nature and amount, intended, and by necessary implication declared, that the State courts should be limited and restricted to that class of cases arising under the provisions of the bankruptcy law; that by this amendment the State courts were deprived of all other authority than that mentioned in it, over actions of this description, and that there was no saving provision in the Revised Statutes which prevented it from including pending actions. The doctrine of this case was re-announced by Judge HALLETT, in *Halleck et al.* v. *Tritch, Assignee*, reported Chicago Legal News, March 30, 1878 ; but the opinion of the learned judge in that case was *obiter*, as the amount in controversy was within the jurisdiction of the court, even under said section two. We cannot yield our assent to this construction of the statute. It was not, within the reasonable interpretation of the language employed, the intention of Congress to either confer or abridge the jurisdiction of the State courts. Their attention was evidently directed to the accumulation of cases in the Federal courts of original jurisdiction, in which the amount in controversy was comparatively small, but which they were bound to hear and determine. Before the amendment they were powerless to order that debts of the class named should be collected in the State courts. By the amendment they are authorized to refuse to entertain actions at common law of the class described in the amendment, and to direct that they shall be brought in the courts of the State, where the bankrupt resides, having jurisdiction of claims of such nature and amount. *Goodrich* v. *Wilson*, 119 Mass. 434.

We are, therefore, of opinion that the State court was not ousted of its jurisdiction by the bankruptcy of W. B. Rockwell. If, as averred in the replication to the plea of *puis darrein continuance*, the plaintiff had *bona fide* long

before his bankruptcy, parted with all his interest in the chose in action, clearly the assignee would have no property or right of property in the pending suit, belonging to the bankrupt at the date of the assignment. Such a chose in action would not pass to the assignee. The bankrupt would stand in the light of a naked trustee. In him would be the legal title only, without any beneficial interest that could inure to the creditors. In such case the assignee in bankruptcy, not being interested as trustee for the creditors, has no duty to perform, and the action is properly brought and prosecuted in the name of the bankrupt. *Carpenter et al.* v. *Marnel*, 3 Bos. & Pul. 40 ; *Hynson* v. *Burton*, 5 Ark. 494 ; *Blin* v. *Pierce*, 20 Vt. 25. May not an action brought before the commencement of bankruptcy proceedings thereafter be prosecuted in the name of the bankrupt (the assignee not seeking to be substituted) even though the judgment obtained should inure in part or exclusively to the benefit of the bankrupt's creditors ? If this question be resolved in the affirmative, the issue as to whether W. B. Rockwell had transferred his interest in the suit to others is immaterial, and the evidence and instructions thereunder need not be considered.

Section 5047 of U. S. R. S. provides : "If at the time of the commencement of the proceedings in bankruptcy, an action is pending in the name of a debtor for the recovery of a debt or other thing which might or ought to pass to the assignee by the assignment, the assignee shall, *if he requires it*, be admitted to prosecute the action in his own name, in like manner and with like effect as if it had originally been commenced by him."

This provision applies exclusively to pending actions. The idea that such actions should abate by reason of the bankruptcy is here clearly negatived. "It is a mistake," says the supreme court of the United States in *Eyster* v. *Gaff et al.*, 3 Otto, 524, "to suppose that the bankrupt law avoids of its own force all judicial proceedings in the State or other courts the instant one of the parties is ad-

judged a bankrupt. There is nothing in the act which sanctions such a proposition."

It seems to be contemplated that the assignee may permit the action to be prosecuted to judgment in the name of the bankrupt, or, if he so elects, he may have himself substituted for the bankrupt. It is only where the assignee *requires* it that the act declares he shall be admitted to prosecute the action in his own name. It is not in the power of the defendants to compel the assignee to substitute his name for that of the bankrupt. Here the assignee, neither by petition or otherwise, sought to be made a party or to take part in the case. The bankrupt was in any view only a nominal plaintiff and payment to a nominal plaintiff by the judgment defendant, with notice, actual or constructive, that he was not the real party in interest, would not satisfy the judgment. The defendants are not prejudiced by the failure of the assignee to have himself substituted for the bankrupt. They were deprived of no ground of defense that would have been open to them, had the action been prosecuted in the assignee's name. *Foster* v. *Wylie,* 60 Me. 109 : *Southern Express Co.* v. *Connor,* 49 Ga. 417.

We are, therefore, drawn to the conclusion, that whether the alleged assignment of the chose in action, one-half to L. C. Rockwell, and the other half to Kate Rockwell, was valid or void, the action was well enough prosecuted to judgment in the name of the bankrupt plaintiff, the assignee in bankruptcy having a knowledge of the existence of the claim and of its prior alleged assignment to others. The defendants can, if in doubt, take proper steps to determine to whom the judgment shall be paid.

The evidence upon which the plaintiff bases his original right to recover is substantially uncontradicted. Watson B. Rockwell was a member of the firm of Cash, Rockwell & Co. The firm owned and operated certain reduction works in Gilpin county during the year 1870, and a portion of the year 1871. They kept their bank account with the defend-

ants, who were doing business under the style of Thatcher, Standley & Co., June 12, 1871. Defendants held two notes, executed by Cash, Rockwell & Co., each for $5,000, the payment of which notes was secured by a deed of trust on the reduction works of Cash, Rockwell & Co.

A week later, Robert Cash, a member of the firm, out of the proceeds of the sale of firm property, liquidated said notes and all accounts which the defendants had or held against Cash, Rockwell & Co. The defendants gave their receipt to Cash in full of all demands against the firm. Mr. Cash was the managing partner. Plaintiff spent most of his time abroad and was not familiar with the business affairs of the firm. He had not been apprised by Mr. Cash that the bank indebtedness had been paid. With an adroitness worthy of a better cause, and for a purpose which subsequent events make apparent, Joseph A. Thatcher, in July, 1872, more than a year after Robert Cash had paid the amount of the notes to the bank, wrote to the plaintiff, then being in New York, a fictitious statement of the bank's. account with Cash, Rockwell & Co., and not only carefully concealed the fact of the payment of the firm indebtedness to the bank, but importunately demanded payment of the plaintiff. Before that time, April 4, 1872, he had written to plaintiff at Cairo, Illinois, urging him to stir Cash up " and to pay some part of the claim." He had also written to Giddings, who was acting in some matters as plaintiff's agent, making the same misrepresentations to him. By such subterfuges and false pretenses, Joseph A. Thatcher induced plaintiff to pay $2,820.93 to be applied upon the two notes. By his subsequent correspondence with Giddings, he refers to the two unpaid notes, and endeavors to have him induce plaintiff to make another payment. There is no attempt to deny that the money whose recovery back is sought by the plaintiff was obtained by the bank from him illegally. There is no attempt to justify the tergiversations of Joseph A. Thatcher. The fact stands out in bold relief and uncontroverted that by fraudulent means he came into possession

of the money. That upon the plaintiff's evidence he is entitled to recover it back with legal interest, there can be no shadow of doubt, unless the defendants interpose a good defense.

Under their pleas they introduced evidence tending to show that they were authorized to apply the money remitted on a certain other note. A Mr. Whiting, residing in Central City, kept an account with the banking firm of Hussey & Co., in the name of "William A. Whiting, agent." Thatcher testifies that plaintiff appeared to be interested in that account.

In November, 1867, plaintiff and Whiting called at the bank to look over the account. It was claimed that Whiting, without authority, had drawn from thatacc ount about $3,000 for his own use. For this sum, Hussey & Co. took the note of Whiting, and credited the account of " Whiting, agent." Thatcher testifies that the inducement to accept Whiting's note was the assurance of plaintiff that he would pay the note out of the proceeds of the sale of certain real and personal property that had been " turned over to him by Whiting." There was no written agreement to assume the debt. The evidence is widely conflicting as to whether the sale to Rockwell was absolute or only in trust, for the payment of certain debts. The Whiting note subsequently became the property of either Thatcher or Thatcher & Standley. Thatcher applied the money, which he had so dexterously obtained from plaintiff, on the Whiting note, but concealed that fact from plaintiff until September or October, 1874. Then, for the first time, Thatcher apprised plaintiff of the ruse he had adopted to secure partial payment of the Whiting note ; that all his letters to him (R.) touching the indebtedness of Cash, Rockwell & Co. were untruthful ; that said notes had been. paid more than three years before ; that he had at once, in fact, applied the money received from him on the Whiting note ; and had for a purpose never canceled the Cash, Rockwell & Co. notes.

This unexpected revelation naturally took the plaintiff by surprise, and after hearing Thatcher recount the whole transaction, and when he handed out the Whiting note to show the plaintiff that he had indorsed thereon a credit of $2,820.93, the plaintiff simply responded, "I see."

May 22, 1875, from Central City, plaintiff wrote to Thatcher as follows :

"CENTRAL CITY, Col., *May* 22, 1875.

Whatever disposition I might have to pay Mr. Whiting's debts, were I in different circumstances, my present financial condition is such that *I cannot consent* that you should apply the amount I paid you upon the Cash & R. notes, to the payment of your claim against the estate of Mr. Whiting, and I must now ask that amount with interest thereon at the rate of 18 per cent per annum."

The appellants do not seek a reversal of the judgment on the ground that it is unsupported by evidence, but they complain of the admission of improper evidence, and assign for error the giving and refusing certain instructions. It is unnecessary to discuss the question as to whether Kate Rockwell, the wife of the plaintiff, was a competent witness, as in our view of the case, as we have already endeavored to show, the issue to which her testimony was directed was immaterial.

The giving of the following instruction is assigned for error :

"The court instructs the jury that if they believe from the evidence that Rockwell, or Giddings for Rockwell, was induced to pay, and did pay into Thatcher, Standley & Co., on February 11, 1873, a sum of money to apply on Rockwell's portion of the Cash, Rockwell & Co. notes, upon representations of Thatcher, that such notes had not been paid, when in fact, such notes had been paid, and he (Thatcher) knew that fact ; and if you believe that when he made these representations he knew them to be false and untrue, and Rockwell, Giddings, and Mrs. Rockwell had

reason to believe such statements and representations of Thatcher to be true, and relied and acted thereon. If you find these to be the facts from the evidence, Thatcher was guilty of practicing a fraud upon them, and the plaintiff can now recover from defendants the money thus paid, with interest thereon at the rate of ten per cent per annum from the day of payment until now." ·

The chief objection urged to this instruction is, that it rests the plaintiff's right to recover upon proof of the fraud practiced by the bank in procuring possession of the money, and entirely ignores the question of set-off as claimed by defendants. This objection would be valid if the jury had not also been instructed upon the question of set-off. Reading this instruction in connection with instruction number five it will be discovered that the jury were properly charged as to the defense of set-off. In construing a charge, each instruction is to be considered in connection with the entire charge, and if considering it as a whole, this court is satisfied that the jury was not improperly advised as to any material point in the case, the judgment should not be reversed on the ground of an erroneous charge. *Union Gold Mining Co.* v. *Rocky Mt. Nat. Bank*, 2 Col. 565.

The instruction " that if Thatcher was the owner of the Whiting note at the time of the commencement of this suit, it was no defense to this suit if you believe from the evidence that Rockwell is liable to Thatcher for the amount of the note, unless the plaintiff subsequently to the application of the money on the Whiting note assented thereto, ratified the application of the same," tended in no way to mislead the jury to the prejudice of the defendants. The evidence as to whether Thatcher individually, or Thatcher and Standley owned the Whiting note is somewhat conflicting. The instruction but asserts the general doctrine that there can be no set-off where the claims are not mutual, that a separate demand cannot be set off against a joint demand. *Burgwin et al.* v. *Babcock et al.*, 11 Ill. 28.

The instruction that *mere* silence on Rockwell's part,

when notified by Thatcher of the application of the money, will not amount to a ratification of Thatcher's unauthorized acts in such application; that there must be some affirmance of the act to bind Rockwell, was, we think, warranted by the evidence. Thatcher having illegally obtained possession of the money by an artifice, it ought not to be said that because Rockwell elected to enforce his rights through the courts rather than to make a fruitless demand of Thatcher at the very time the fraud was made known to him, he was estopped by his silence and temporary inaction to deny a ratification of Thatcher's act in unlawfully appropriating his (Rockwell's) money. It is, however, in evidence, as we have seen, that, before bringing the suit, Rockwell, by letter, demanded the return of the money. We should, even had there been no such letter, hesitate to announce the doctrine that the jury would be at liberty to infer that mere temporary silence, under the circumstances detailed, would amount to a ratification.

Although the twelfth instruction is somewhat loosely worded, the jury, we think, could not fail to understand it. It recognizes the rule that an agreement, if it be not collateral, but in the nature of an original agreement to pay the debt of another, founded on a sufficient consideration received by the promisor himself, is not within the provisions of the statute, and, therefore, need not be in writing; but if the agreement to answer for the debt of another be wholly collateral, it must be in writing.

Discovering no error in the record that would warrant a reversal of the cause, the judgment of the court below is

*Affirmed.*